No. 36,324

MARGERY BERLE SOWDEN, *Appellee*, v. RALPH DELORE SOWDEN, *Appellant*.

(160 P. 2d 653)

Opinion filed July 17, 1945.

*Lester M. Goodell*, of Topeka, and *Kirke W. Dale*, of Arkansas City, argued the cause, and *Albert Faulconer* and *Donald Hickman*, both of Arkansas City, were on the briefs for the appellant.

*M. F. Cosgrove*, of Topeka, argued the cause, and *Clayton E. Kline*, *Balfour S. Jeffrey* and *Robert E. Russell*, all of Topeka, were on the briefs for the appellee.

The opinion of the court was delivered by

HARVEY, C. J.: This was an action for divorce in which a decree of divorce was granted to plaintiff, and defendant has appealed.

Appellant does not question the part of the decree granting the divorce, but complains of the judgment for alimony in favor of the plaintiff. Plaintiff is the daughter of a well-known physician in Topeka. She is a graduate in home economics and dietetics of Kansas State College and had a year of postgraduate work in the Woman's Educational and Industrial Union in Boston. Defendant is a graduate of Northwestern University with a degree in commerce from the School of Business. The parties became acquainted in July, 1941, and were married March 14, 1942. At the time of their marriage plaintiff was employed as a dietitian at the N. Y. A. school in Arkansas City and was receiving a salary of $90 to $100 per month plus her board and room. The defendant was doing clerical work in the New Era Mill in Arkansas City at a salary of $114 per month and was taking a pilot's training course at Ponca City, Okla., in order to qualify as a civilian instructor. His father was employed at the mill where he worked and owned some shares of

stock of the milling company, most of which was owned by a Mrs. Hunt and her family. Following their marriage they went to San Antonio, Texas, where defendant was to finish training as a civilian flight instructor. He completed his course of training there in September, 1942, and the couple came to Topeka, where defendant was employed as a flight instructor at Washburn College, which work continued until July 1, 1944. His earnings there varied, but averaged about $260 per month.

When they were married plaintiff owned a 1939 Nash automobile which she had purchased by turning in a Ford car at $150 and agreeing to pay $583 in monthly payments, five of which aggregating $242.87, she had paid prior to the marriage. There was a balance due upon the automobile of about $340. She had no other property. At the time of the marriage defendant had between $400 and $500 in money and a Ford car, which he soon sold for $620. During the nearly six months he was in training at San Antonio the mill where he had worked and his father sent him $100 per month. While they were in San Antonio a man boarded and roomed with them, for a time, but the financial arrangements with respect to that are not disclosed. When they came to Topeka in September, 1942, defendant had paid the balance due on plaintiff's automobile and they had about $160. They rented a furnished apartment, for which they paid $65 per month. In October, 1942, they traded the 1939 Nash automobile for a new Nash 1942 model, the price of which was $1,177, on which they were allowed $425 for the 1939 Nash. The balance due on the new car was paid by defendant. From February 15 to August 1, 1943, plaintiff worked at the Santa Fe offices at a salary which began at $88 per month and was increased to $115, out of which she purchased three United States bonds of a total maturity value of $75. At Christmas, 1942, Mrs. Hunt gave defendant a United States bond of a maturity value of $50. Defendant was carrying a $2,000 life insurance policy, the cash surrender value of which, if any, was not shown. In August, 1943, plaintiff had a major operation performed at the hospital in which her father assisted the surgeon and who, because of a comity between physicians, made no charge for his services. Plaintiff's father paid the hospital bill. Early in 1944 defendant had an operation for hernia, and again plaintiff's father assisted the surgeon, who made no charge. This operation incapacitated defendant for work for perhaps three months.

On June 13, 1944, because of the differences between the parties, plaintiff left the apartment where they lived and went home, taking with her the keys for the automobile, which she stored. Their bank account at that time was $86.24. The parties had acquired no furniture. At the time of their marriage they had been given wedding presents by their respective relatives and friends of an aggregate value of not to exceed $500.

On July 7, 1944, plaintiff brought this action for divorce on the grounds of extreme cruelty and gross neglect of duty, and also asked for the restoration of her maiden name, for temporary and permanent alimony, suit money, and attorneys' fees.

On August 4, 1944, defendant filed an answer which contained a general denial, with an admission of the marriage of the parties, the residence of the plaintiff, and that no child had been born to the union, all as alleged in the petition.

On the same day plaintiff filed a motion that an emergency be declared and that the action be heard before the expiration of sixty days after the filing of the petition (as authorized by G. S. 1935, 60-1517). This motion was heard promptly. It was supported by the testimony of plaintiff's father and another witness to the effect that there was grave danger of a physical and nervous breakdown of plaintiff unless there was an immediate trial of the divorce action so that she would be relieved of the mental and physical strain existing under the circumstances. The motion was sustained and the trial proceeded the same day.

After hearing the evidence and the argument of counsel the court announced its decision by which it granted plaintiff a divorce upon the sole ground of gross neglect of duty, restored plaintiff to her maiden name of Margery Berle Morris, awarded to plaintiff the Nash, 1942, automobile, and directed defendant to deliver to plaintiff a bill of sale for the automobile and all gas coupons for its use; told the parties to divide the wedding presents, the plaintiff to have those given by her friends, the defendant to have those given by his friends; decreed that each party should retain the United States bonds then in the possession of each, and that the defendant retain his life insurance policy and bank account, then $57.13; and further awarded plaintiff a judgment for alimony against defendant for the sum of $2,500, to be paid through the office of the clerk of the district court at the rate of $50 per month until the full sum was paid; and further rendered judgment in favor of plaintiff and against de-

fendant for the costs of the action, including an attorney's fee in the sum of $250, for which execution was to issue. Defendant filed a motion for a new trial, specifically directed to the alimony award of $2,500 to be paid in installments and to the judgment for an attorney's fee of $250, upon which execution was to issue. This motion was argued and overruled, and defendant appealed.

In this court appellant complains only of the $2,500 alimony award, contending it was grossly excessive, if indeed any sum should have been awarded for that item, and of the judgment of $250 for plaintiff's attorney's fee, contending it was grossly excessive. Since defendant, as appellant here, does not complain of the fact that a decree of divorce was granted to plaintiff, his counsel did not abstract the evidence relating thereto. Counsel for plaintiff has brought that evidence before the court by a counter abstract, perhaps for the reason that he thought it would be helpful to the court in passing upon the questions raised here by appellant, and we shall so consider it. Plaintiff testified to their marriage, where they lived and what they did substantially as hereinbefore stated; that they kept a joint bank account in which was deposited his earnings and hers; that she "kept the check stubs." She testified that she knew defendant had no property, except that above enumerated, and that he had no income other than his salary. There is no suggestion in her testimony that defendant was either reckless or extravagant in the use of their money, which appears to have been used for their living expenses and the purchase of automobiles. She further testified that at the time of her operation in 1943 she was advised by her physician that if she ever wanted a family she should not put it off long. She told defendant about that and asked what he thought about it. He said he didn't feel it was the time to have a family and asked her opinion. She said she thought it was not the most ideal time, but if it was a matter of having a family now or never she thought they should, if they ever wanted children, which she did. She thought they were not living a normal married life and worried about it. There were several occasions when he came home from his work an hour or two later than she had expected him, and on a few occasions when he was not busy with work on Saturday afternoons he went down town for several hours instead of staying at the apartment and visiting with her; and on one occasion when she expected him to treat her with affection he did not do so, and when she mentioned the matter to him he said it meant

nothing to him. She spoke of this latter incident as a matter which might seem trivial, but which to her was real. We can see how it might tend to evidence a growing estrangement. She spoke of some other incidents, not clearly described in the testimony and which we shall not attempt to detail. She talked with defendant about them, or some of them, on various occasions. As to most of them he was inclined to treat them as being of little consequence. She did not look at them that way. There were many things which it seemed to her they could not talk over fully. They talked over these matters many times and each agreed that a serious effort would be made to try to get along. On Saturday before she left him on Tuesday they had a long talk, at which each of them suggested matters for discussion, both of them cried, but without reaching any definite result.

Plaintiff's father, called as a witness in her behalf, testified:

"I had a conversation with the defendant shortly after my daughter came home in June; this was the occasion of their separation. The defendant called at the house and wanted to know if Margery was there. I told him she was, but she wasn't well and didn't feel like talking to him at that time, but that I would like to talk to him later and see what we could do about the situation. My object in seeing him was to see if something could be done to bring them together. Dee seemed to take all the blame; he said he guessed he just couldn't make Margery happy; he didn't condemn Margery in any way but said she was a fine girl and there wasn't any complaint he could make; he said, 'I guess it is all me. I guess I just don't have enough love and affection to make Margery happy.'"

Later he went to defendant's apartment, where he talked with him for quite awhile, with substantially the same result. He testified that he had these talks with the defendant in order to see if he could get the two young people back together and see if they could make a success of their marriage; that he did everything in his power to make it work out. He was asked and answered the following question:

"You did that, of course, in an attempt to get them back together? A. Sure. I like Dee, and I wanted to see them be happy."

Defendant, called as a witness in his own behalf, testified that at the time of the marriage he was doing clerical work at the mill; that although he was a graduate of Northwestern University, with a degree in commerce from the school of business, he had no technical skill along mechanical or any other lines, only his flight instructor's ability; that his employment as flight instructor at Washburn

College ended July 1, 1944, because the class he was instructing had finished its training course. Following that he had no work for about two weeks and then was employed at the Topeka Flying Service to give flight instructions to civilians who were working and who had to take their instruction before eight o'clock in the morning or after five in the afternoon; that in this work he received $3 per hour for the time flown; that for the month preceding the trial he had earned at that work about $165; that this work was temporary in character; that he had made application to join the Navy and had passed the physical and mental tests and was awaiting a call to active duty; that when called he would be classed as an aviation pilot at a pay of $78 per month; that if he completed further training, which would take about five months, he hoped to be commissioned as an ensign, and then if he were sent overseas his pay would be $280 per month, out of which he would have to buy his own uniforms and pay his living expenses; that if he was not called to the Navy there was but little chance of his getting permanent work as a civilian flying instructor and that he would go back to his job in the mill at the same salary he had when he was married; that he had retained the apartment where he and his wife had been living for the reason that his future plans were uncertain and it was well located for the work he was then doing.

It was stipulated that at the time of the trial the top ceiling price of the 1942 Nash automobile owned by the parties was $1,030.

We turn now to the questions argued here. Since the evidence disclosed that the parties could not continue their marital relations harmoniously defendant makes no complaint of the fact that the court granted a divorce to plaintiff. Neither does the defendant object seriously to the division of the property between the parties made by the trial court, although the overall picture of the testimony pertaining to that matter discloses that plaintiff's financial status was improved as a result of the marriage and divorce from the possession of an automobile on which there was an indebtedness of $340 to that of having, clear of debt, an automobile of the value of $1,030; while defendant's financial status decreased from the approximately $1,100 he had at the time of marriage to less than $100. But in view of the fact that the court had made this division of the property defendant complains bitterly, (1) that the court made an award and rendered a judgment against him in favor of the plaintiff in the sum of $2,500, to be made in monthly payments

extending over more than four years, and (2) in including in the cost of the action against him an item of $250 for plaintiff's attorney, upon which execution should issue.

Respecting the alimony award, the legal questions involved are quite well settled by former decisions of this court and are to this effect: Under G. S. 1943 Supp. 60-1511, the court, in the proper case, may in its discretion render a judgment for an alimony award to be paid from future earnings; that the exercise of this authority is a judicial discretion and must be predicated upon a good reason therefor shown by the evidence in the case. It is not a power to be exercised without just cause. When complaint is made in this court that such a judgment is excessive, or that it is inadequate, the court will examine the question and decrease the judgment or increase it as it determines the facts justify. (See *Flautt v. Flautt,* 126 Kan. 21, 266 Pac. 746; *Mann v. Mann,* 136 Kan. 331, 15 P. 2d 478; *Landers v. Landers,* 138 Kan. 538, 27 P. 2d 231, and authorities cited therein.) Counsel have cited and commented upon our earlier cases dealing with this question. Only as they tend to emphasize the general principles just stated they are not particularly helpful to the solution of the problem before us, for the reason that each of them deals with its own particular state of facts. Without restating the facts hereinbefore set out it seems clear to this court that the judgment against defendant for alimony in the sum of $2,500 was not justified. There had been no trouble between the parties over financial matters. Aside from the few months directly after the marriage when defendant was taking training, of which the plaintiff nowhere complains, defendant was employed at a fairly good salary, plaintiff was employed for about five and one-half months; they had no income other than their earnings, which were put in a common fund and used in a manner of which no complaint is made by either of them. The charge against defendant of extreme cruelty made by plaintiff in her petition was not sustained by the evidence and the court did not find that any such cruelty existed. There was no evidence that defendant had any bad habits such as drinking or gambling, or that he had any immoral habits or associated with persons of ill repute. The only difficulty between them, which perhaps was serious enough, arose from incompatibility respecting their domestic and private relations. In this case, after defendant had paid the normal court costs, he had nothing more than one would need for current expenses.

We see nothing in this record to justify the large award and judgment against defendant for alimony to be paid in the future. Indeed, in view of the disposition of the property of the parties made by the decree, if the court had made no award and judgment against defendant for alimony to be paid in the future, and plaintiff was here complaining of that fact, we would have difficulty in finding any reason to justify her complaint. These parties are still young. He was twenty-seven at the time of the trial. Her age was not given, but we may assume it did not exceed his. He was entering the navy, a more hazardous employment than the normal employment in civil life, where his salary would be much less than he had been earning. Either party might marry before these payments were made. In the event of his death before the full sum was paid the plaintiff would have a claim against his estate; in the event of her death prior to that time the judgment could be revived for the balance due in the name of her personal representative. (See *Bourman v. Bourman*, 155 Kan. 602, 127 P. 2d 464, and cases there cited.) These facts tend to complicate the lives of both of them.

Plaintiff did not bring suit for alimony alone, in which if she recovered she might receive payments indefinitely; she brought an action for divorce, the very nature of which is to close not only the marital relations but the financial affairs of the parties as between them.

After the decree of the court defendant could not make any of the payments on the alimony judgment without placing himself in such a position that he would have been held to have complied with the judgment and could not proceed with his appeal. After the case reached this court, upon plaintiff's application, the court made an order that defendant should pay to the clerk of this court, for the benefit of plaintiff, $50 per month pending the further order of the court, and also should pay $50 to be used by plaintiff as expense money in the preparation of her defense to the appeal. This court is always slow to set aside an order of the trial court which is in its discretion. In deference to that this court feels it should sustain as much of the order as under any circumstances it would be possible for the court to conceive that the trial court was justified in making. The only reason we find for any additional allowance of alimony to be paid from future earnings is the fact that at the time of the trial plaintiff was nervous and worried.

Our judgment is that $900 is the maximum which should have been allowed as alimony to be paid from future earnings, and upon that should be credited the sums paid plaintiff under the order of this court relating to payments of alimony pending the further order of this court.

Respecting the second item complained of by defendant in this court, the judgment against defendant for an attorney's fee of $250 to be paid as a part of the costs of the action, for which execution should issue, it is this court's judgment that the sum was too large and that an allowance of $150 is the maximum which should have been allowed. Inasmuch as the defendant brought the case to this court and plaintiff had to have an attorney to represent her here, for which an attorney's fee is claimed, we have concluded to allow an attorney's fee for the services of plaintiff's attorney in this court of $100 and to further modify the judgment of the trial court with respect to when the attorney's fee should be paid so as to provide that the total attorneys' fees of $250 for services in both courts instead of being subject to execution shall be made payable at the rate of $50 per month beginning at the termination of the payment of the alimony judgment to plaintiff of $900, with the credits above mentioned. The payment of alimony through the clerk of this court shall cease with the payments made by the date of the filing of this opinion and the future payments of alimony and attorneys' fees shall be made through the office of the clerk of the district court, beginning August 1, 1945.

The judgment of the trial court should be modified in harmony with the views of this court. It is so ordered.

PARKER, J., dissents.